IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs September 14, 2010

SPENCER PETERSON v. STATE OF TENNESSEE

Appeal from the Criminal Court for Shelby County
Nos. 01-04380-83, 01-04385-92    John T. Fowlkes, Jr., Judge

No. W2009-02433-CCA-R3-PC  - Filed November 17, 2010

The petitioner, Spencer Peterson, appeals the denial of his petition for post-conviction relief, arguing that the post-conviction court erred in finding that he received the effective assistance of counsel. After review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which J.C. MCLIN and D. KELLY THOMAS, JR., JJ., joined.

Claiborne H. Ferguson, Memphis, Tennessee, for the appellant, Spencer Peterson.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; William L. Gibbons, District Attorney General; and Rachel Newton, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

The petitioner was involved in the robbery of nine men during which one victim was killed and two were wounded. After a trial, a Shelby County Criminal Court jury convicted the petitioner of three counts of second degree murder, two counts of attempted second degree murder, eight counts of aggravated robbery, one count of aggravated burglary, three counts of attempted especially aggravated robbery, and two counts of attempted aggravated robbery. The trial court merged the three second degree murder convictions as well as the separate convictions of aggravated robbery involving the same victim and sentenced the petitioner to consecutive terms of twenty years for the second degree murder conviction and eight years for each of the four aggravated robbery convictions. The court ordered

concurrent sentences for the remaining convictions, for an effective sentence of fifty-two years in the Department of Correction. On appeal, this court affirmed the petitioner's convictions but remanded the case for entry of corrected judgments and for the trial court to set out its reasons for consecutive sentencing. See State v. Spencer Peterson, No. W2003-02939-CCA-R3-CD, 2004 WL 2791621, at *1 (Tenn. Crim. App. Dec. 6, 2004), perm. to appeal denied (Tenn. Mar. 21, 2005). The Tennessee Supreme Court denied permission to appeal. See id. In a subsequent direct appeal, this court affirmed the imposition of consecutive sentences, see State v. Spencer Peterson, No. W2005-01701-CCA-R3-CD, 2006 WL 1215138, at *1 (Tenn. Crim. App. May 5, 2006), perm. to appeal denied (Tenn. Oct. 2, 2006), and the Tennessee Supreme Court again denied permission to appeal. See id.

Our original direct appeal opinion provides the following summary of the evidence presented at the petitioner's trial:

> At approximately 8:00 p.m. on September 29, 2000, nine Hispanic men were in a Memphis apartment when two masked African-American men entered through the cracked door. One was armed with a pistol and demanded money, while the second remained by the door to prevent anyone from leaving. During the course of the robbery, the gunman shot one victim in the leg, a second victim in the arm, and a third victim in the chest, causing his death. Acting on a tip, the police arrested the defendant two days later and brought him to the homicide office, where he admitted participating in the robbery and sharing in the proceeds, but denied that he shot anyone or had any prior knowledge of his accomplice's intention to fire his weapon.

> Prior to trial, the defendant filed a motion to suppress his statement, arguing, among other things, that it was the product of an unlawful detention and was neither knowingly nor voluntarily given. The sole witness at the November 29, 2001, suppression hearing was Sergeant James L. Fitzpatrick, one of two Memphis police officers who participated in recording the statement. Sergeant Fitzpatrick identified the defendant's signed waiver of rights and his statement, which were admitted as exhibits to the hearing. He testified that police investigators who "saturated the area" immediately after the crime located three or four separate witnesses who, based on details the defendant had leaked in conversation, identified the defendant and his codefendant as the perpetrators of the crime. As a result of that information, police officers were actively searching for the defendant for at least two days prior to his arrest.

Sergeant Fitzpatrick testified the defendant was arrested on October 2, 2000, at approximately 6:00 p.m. and brought to the homicide office at about 6:30 p.m. He said he and Sergeant Sheffield read the defendant his rights at 8:43 p.m., obtained his signed waiver of rights at 8:45 p.m., began taking his formal statement at 9:33 p.m., and completed the written statement, initialed and signed by the defendant, at 10:36 p.m. The defendant was under arrest at the time the statement was taken, but was not formally charged until shortly thereafter. Sergeant Fitzpatrick stated that the purpose of the interview was to give the defendant a chance to either confirm or refute the information the police had obtained from their witnesses. He agreed there was sufficient probable cause for the defendant's arrest and testified that the defendant would have been charged regardless of whether or not he gave a statement.

The trial court subsequently overruled the motion to suppress, and the defendant was tried before a Shelby County Criminal Court jury from May 12-15, 2003. Memphis Police Officer Adrienne Dobbins testified she was patrolling with her partner in the Hickory Hill area of Memphis between 8:00 and 8:30 p.m. on September 29, 2000, when she received a report of a home invasion robbery with three gunshot victims at the Marina Cove Apartments. Upon entering the apartment, she observed blood spattered on the carpet, the three gunshot victims, and several other individuals. Officer Dobbins testified that one of those individuals who spoke English related that he and the others had been inside the apartment when two masked African-American men entered with a pistol, demanded money from everyone, shot three victims, and fled.

In a reiteration of his suppression hearing testimony, Sergeant Fitzpatrick testified that the defendant was arrested at approximately 6:00 p.m. on October 2, 2000, and brought to the homicide office, where Sergeant Fitzpatrick was asked to participate in his interview. After first familiarizing himself with the case, he advised the defendant of his rights and obtained a written waiver at 8:45 p.m., began taking the defendant's statement at 9:30 p.m., and completed the written statement at 10:36 p.m., which the defendant signed and initialed in his presence. On cross-examination, Sergeant Fitzpatrick acknowledged that the defendant turned eighteen on October 1, 2000, the day before his October 2 statement was taken, and had therefore still been a juvenile on September 29, 2000, when the crimes were committed.

In the statement, which Sergeant Fitzpatrick read aloud for the jury and

which was admitted as a trial exhibit, the defendant said that he and "Tweety"[1] had decided to rob someone two or three days before the incident occurred and that Tweety had obtained a gun from "Twin." He stated that they chose the victims' apartment because the door was cracked open, that they entered together, and that Tweety demanded money while displaying the gun. According to the defendant, Tweety reacted with violence when the victims were initially slow to produce their money:

> He shot at one of the guy's leg, and I didn't know that he had shot him at first until I saw him grab his leg. I was standing by the door. I did not leave the door, but I saw after the guy got shot in the leg, they put the money on the table.
>
> I seen [sic] the second one get shot, but I don't know if it was before or after the money was put on the table. I saw the second one go down holding his arm after the shot.
>
> Tweety got the money off the table went in another room, and I couldn't see him. I heard more gunshots, either one or two, and then Tweety came back from the other room, and we ran out the door.
>
> We ran by the pool and dropped our clothes, and we had some clothes up under the clothes that we dropped. After that, we went back up front of the apartment complex by Twin's house and acted like we didn't know what happened.

The defendant stated that he received half of the $500 robbery proceeds. He said he was not armed, did not know that Tweety was going to shoot anyone, and had thought that all Tweety intended to do was to "show the gun and get the money."

The State's next witness, Hector Moreno, testified through an interpreter that he and three friends were talking and playing cards in the living room when two masked African-American men dressed in black entered the apartment. He said that the taller of the two was armed with a gun

---

[1] From the statements of counsel and the trial court, it appears that the codefendant, Darius Jones, was tried separately and convicted, *inter alia*, of first degree felony murder.

-4-

and demanded their money, while the shorter man remained by the door to prevent anyone from leaving. The gunman took the money from the table where Moreno and his friends had been playing cards, and shot Moreno in the right hand as he was reaching for his wallet. Moreno testified that the gunman shot "Pablo" in the leg a few minutes later. He said that the gunman went into the kitchen and he could hear him asking for money from the men there, but he did not hear any gunshots. While the gunman was in the kitchen, the masked man who remained in the living room beside the door ordered Moreno, in a "[v]ery mad" tone of voice, to take off his shoes so he could see if he had any money hidden inside them. Moreno testified that before leaving, the gunman shot "Armondo" in the chest, and Armondo later died from his injury. He acknowledged that the man who remained beside the door did not have a gun. However, he testified that the man was still waiting at the door for his accomplice at the time Armondo was shot and that the two men appeared to flee the apartment together. Moreno identified a photograph of Armondo Becerra while he was alive, which was admitted as a trial exhibit over defense counsel's objection, and another "morgue photograph" of Becerra, which was admitted for identification only.

Enrique Diaz[2] testified through an interpreter that five men were in the kitchen and he and three others were playing cards in the living room when two masked African-American men, one armed with a gun, rushed in. While the shorter man remained by the front door to block anyone from leaving, the gunman took their money from the card table; demanded more money from Hector Moreno and shot him when he said he did not have any; took the $400 Diaz had in his wallet; shot Pablo Alvarado in the leg when he and Armondo Becerra said they did not have any more money; went into the kitchen pointing his gun; came back from the kitchen; started out the apartment door after the second man; turned and shot Armondo Becerra; and then left the apartment, closing the door as he left. Diaz estimated that the gunman left twenty seconds after his companion, or "[j]ust the time that he shoot somebody else[.]" He said that the second man who blocked the door did not make any statements or threatening motions, but that he was afraid of him. He acknowledged he had speculated in his statement to police that the second man "must have been the lookout."

The State's next two witnesses, Carlos Diaz Ponce and Hector

_____

[2]Although this witness was called to the stand by the name "Enrique Diaz Castello," he testified that "Castello" was his mother's maiden name and that he went by "Diaz," his father's last name.

Martinez, were among the group of five men in the kitchen. Ponce testified through an interpreter that he started toward the living room from the kitchen, saw the gunman, and returned to the kitchen to inform his friends. He said that the men in the kitchen were attempting to hide their wallets in the trash and in the refrigerator when they heard two gunshots from the living room. The gunman then entered the kitchen and took money from three of them, excluding Ponce and Martinez because neither had any money. Ponce said he heard a third and final shot after the gunman had left the kitchen. Martinez, who also testified through an interpreter, corroborated Ponce's account, testifying that he heard two gunshots from the living room before a masked gunman came into the kitchen and demanded money from the five men there, took money from the three that had money, and then left. Martinez also heard a third gunshot from the living room just before the gunman left the apartment. From their positions in the kitchen, neither Ponce nor Martinez was able to see the shootings or the man who stood guard at the front door.

Dr. Teresa Allen Campbell, the Shelby County medical examiner who performed the autopsy of Armondo Becerra's body, testified that he died as the result of a gunshot wound to the left lower chest in which the bullet entered the abdomen and lacerated the liver, causing him to bleed to death. She identified the morgue photograph of Becerra as the man on whom she had performed the autopsy, which was then admitted as a trial exhibit.

Alfonso Enrique Becerra, Armondo Becerra's brother, testified through an interpreter that he was between the kitchen and the living room when the two intruders entered. He said that the one with the gun demanded and took money from the men in the living room, shot two people, came into the kitchen and took money from two or three men, returned to the living room and, just before leaving the apartment, shot his brother, who was sitting on a couch beside the door. The witness testified that the second man remained beside the door and that both men departed together after the gunman shot his brother. He acknowledged that the second man was unarmed and that he never heard him say anything.

The State's final witness was Memphis Police Officer Ricky Davison of the Crime Response Unit, who identified several photographs of the apartment and a sketch he had drawn of the floor plan, which showed that the apartment's front door was visible from the kitchen doorway.

The defendant elected not to testify and rested his case without

presenting any proof.

Spencer Peterson, 2004 WL 2791621, at *1-4.

The petitioner filed a petition for post-conviction relief on September 13, 2007, and after the appointment of counsel, an amended petition was filed. In his petitions, the petitioner argued, among other things, that he was denied the effective assistance of counsel.[3] The post-conviction court conducted three evidentiary hearings over the course of nine months.

At the first hearing, the petitioner's appellate counsel testified that he raised issues concerning the sufficiency of the evidence and sentences imposed by the trial court. Appellate counsel also challenged the trial court's ruling on the suppression motion. Appellate counsel elaborated that he "kind of backed up and addressed the issue of the sufficiency of the initial arrest, which had been presented and preserved on the record by the trial attorney." He then argued further that "any evidence from that point forward would have been fruit of the poisonous tree as set out under the case of State v. Huddleston[, 924 S.W.2d 666 (Tenn. 1996)]." Appellate counsel stated that issues concerning evidentiary rulings of the trial court were raised on appeal as well.

On cross-examination, appellate counsel said that he did not recall receiving correspondence from the petitioner listing twelve issues that he wished to raise on appeal. Appellate counsel said that he reviewed the trial transcript several times before drafting the appellate brief and did not raise any issues that were not preserved at trial or did not "merit[] any discussion in the brief." Appellate counsel stated that he could not think of anything he could have or should have done differently in representing the petitioner on appeal.

The petitioner's trial counsel testified that he filed a motion to suppress the petitioner's statement to police based on State v. Huddleston and that the sole reason for the petitioner's detention was for the police to investigate further and extract a confession from the petitioner. Asked if he investigated whether the police had probable cause to arrest the petitioner, trial counsel said that he "d[id] not have an independent recollection" of it, but "you always [look at that] because that's the . . . first threshold question." He said that "usually speaking [he] w[ould] look to see . . . obviously whether or not there [wa]s a decent probable cause issue to raise." Trial counsel stated that the motion to suppress concentrated "pretty much on the Huddleston issue[, but he] probably considered as to whether or not there was probable cause" for the arrest.

_____

[3] The petitioner raised additional issues, but at the hearing on July 10, 2009, he withdrew all issues except ineffective assistance of counsel regarding the Fourth Amendment claims.

Trial counsel acknowledged that had the petitioner's statement been suppressed, there would have been very little evidence against him to sustain a conviction. He acknowledged that he did not interview any of the individuals who told the police that the petitioner was involved in the crimes. He explained that he relied on what was in discovery and what he learned from the petitioner to evaluate whether the police had probable cause to arrest the petitioner. He said that had any of the information "raised a red flag" or he saw any issue regarding the validity of the petitioner's arrest, he would have conducted in-depth research into the matter and included it in the motion to suppress. Trial counsel stated that there is a duty to not file frivolous claims, and "[y]ou just can't raise issues that you know you're not going to prevail on."

The petitioner testified that he was arrested in his home the day after his eighteenth birthday. His two younger sisters and his mother's boyfriend, Rodney Williams, were present when he was arrested. The petitioner saw the discovery against him and learned that Williams had signed a consent to search the home, but the petitioner did not see Williams sign the document. The petitioner recalled that the day he was arrested, he was in his bedroom when he heard an unfamiliar female voice. He could not see the front door from his bedroom, and he normally kept his bedroom door closed. Upon hearing the unfamiliar voice, he came out of his room and saw a female police officer "by the kitchen . . . almost in the living room." There was another officer present as well. The petitioner did not see the officer enter the house or know how she got inside.

The petitioner testified that the female officer was talking to one of his juvenile sisters, and Williams was standing in the living room not with an officer. When the officers saw the petitioner, they told him that he was wanted for questioning, placed him in handcuffs, and took him away. The petitioner said that he did not give the officers permission to be inside the house, and he did not hear them knock or hear anyone else give them permission to enter the house. The officers did not have an arrest warrant, search warrant, or any other paperwork with them. The petitioner stated that Williams had permission to be at the house, but he had never seen Williams answer the door before. The petitioner said that trial counsel never talked with him about what happened when he was arrested or how the officers got in the house.

On November 17, 2009, the post-conviction court entered a written order denying the petitioner's request for relief. The court found that trial counsel did not raise the issue regarding the entry into the petitioner's home because counsel did not find it to be a viable issue and that the petitioner did not prove that the officers entered his home without permission and did not call Rodney Williams to provide any testimony regarding the consent he gave to search the residence. The court also found that the petitioner failed to provide any evidence that a motion to suppress based on a warrantless arrest or no probable cause

-8-

to arrest would have been successful. The court further found that the issue regarding probable cause to arrest the petitioner was already determined on direct appeal.

## ANALYSIS

The petitioner argues that he received the ineffective assistance of counsel. The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f) (2006). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de novo*, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)).

The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

The reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). The fact that a strategy or tactic failed or hurt the defense does not alone support the claim of ineffective assistance of counsel. See Thompson v. State, 958 S.W.2d 156, 165 (Tenn. Crim. App. 1997). Finally, a person charged with a criminal offense is not entitled to perfect representation. See Denton v. State, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). As explained in Burns, 6 S.W.3d at 462, "[c]onduct that is unreasonable under the facts of one case may be perfectly reasonable under the facts of another."

The petitioner argues that he received the ineffective assistance of counsel because trial counsel failed to challenge the admissibility of his statement to police on Fourth Amendment grounds. He asserts that the police entered his home without consent and without an arrest warrant, and trial counsel did not "question the probable cause basis of the arrest, [and] ma[de] no inquiry into the statements of those who accused the [petitioner] to the police."

Upon review, we conclude that the petitioner failed to prove that he received the ineffective assistance of counsel. As to the petitioner's argument that counsel failed to question whether there was probable cause for the arrest, counsel, an attorney with forty years of criminal defense experience, testified that although he did not have an independent recollection of looking at whether there was probable cause, he probably considered it because "you always [look at that] because that's the . . . first threshold question." He elaborated that "usually speaking [he] w[ould] look to see . . . obviously whether or not there [wa]s a decent probable cause issue to raise." Counsel said that none of the information he obtained in discovery or learned from the petitioner "raised a red flag" as to the validity of the petitioner's arrest, or he would have conducted in-depth research into the matter and included it in the motion to suppress. Trial counsel explained that there is a duty to not file frivolous claims, indicating that his decision to not pursue the probable cause issue was because "[y]ou just can't raise issues that you know you're not going to prevail on." Moreover, the petitioner failed to present any evidence or witnesses at the evidentiary hearing that would support his assertion that his statement would have been suppressed had counsel investigated the source of the information that led to his arrest. Therefore, the

-10-

petitioner has failed to prove any deficiency in counsel's performance or any prejudice caused by an alleged deficiency.

Furthermore, the issue of whether there was probable cause to arrest the petitioner was arguably, as noted by the post-conviction court, already determined by this court on direct appeal. At the evidentiary hearing, appellate counsel testified that he "kind of backed up and addressed the issue of the sufficiency of the initial arrest, which had been presented and preserved on the record" by the trial attorney. In our opinion on direct appeal, this court stated that "the [petitioner] asserts in his brief that the police 'lacked sufficient probable cause to detain him,'" and after reviewing the record, this court concluded that "there is nothing in the record to suggest that the police lacked probable cause to arrest the defendant or detained him without probable cause for the sole purpose of extracting his confession." Spencer Peterson, 2004 WL 2791621, at *8.

As to the petitioner's argument that trial counsel failed to investigate whether "the police entered lawfully into [his] home to make the arrest" by "interview[ing] the officers who made the arrest, [or] those family members who were there at the time," the petitioner presented no evidence that the police entered his home without permission. Instead, the evidence presented indicated that the entry was with consent. The petitioner testified that he was in his bedroom with the door closed when the police entered the apartment. When he came out of his room, two officers, the petitioner's two sisters, and the petitioner's mother's boyfriend, Rodney Williams, were present. The petitioner testified that he did not know who opened the door to let the police in. A form giving the officers permission to search the premises, signed by Rodney Williams, was entered into evidence. The petitioner presented no evidence to contradict the validity of the consent. Therefore, the petitioner has failed to prove any prejudice caused by any alleged deficiency in counsel's performance.

## CONCLUSION

Based on the foregoing authorities and reasoning, we conclude that the petitioner has not met his burden of showing that trial counsel was ineffective in his representation. Accordingly, we affirm the denial of the petition for post-conviction relief.

_____
ALAN E. GLENN, JUDGE

-11-